# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

## CRIMINAL COMPLAINT

**RAFAEL GONZALEZ**
**14 Cousins Street, #2**
**Salem, MA, and**
**LAWRENCE PITCHER**
**92 Warren Street**
**Lynn, MA**
(Name and Address of Defendant)

CASE NUMBER: $05$-$\eta$-$\wp\wp\wp 1$

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about sometime in <u>March 2005 and continuing until June 2005,</u> in <u>Essex</u> County, in the District of <u>Massachusetts</u> the defendant did, (Track Statutory Language of Offense)

knowingly and intentionally conspire with one and other and with other persons unknown, to distribute 500 grams or more of cocaine, a Schedule II controlled substance, and oxycodone, a Schedule II controlled substance in violation of Title <u>21</u> United States Code, Section(s) <u>846 and 841(a)(1),</u> <u>(b)(1)(B)(ii), and (b)(1)(C)</u>.

I further state that I am a(n) <u>U.S. Drug Enforcement Administration</u> and that this complaint is based on the
                                        Official Title
following facts:

See Attached Affidavit of Task Force Agent Eric Kotchian

Continued on the attached sheet and made a part hereof:    X Yes    ☐    No

Signature of Complainant
ERIC KOTCHIAN
Task Force Agent
U.S. Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

<u>June 1, 2005</u>
Date

<u>Boston, Massachusetts</u>
City and State

UNITED STATES MAGISTRATE JUDGE
Lee T. Swicki

Name and Title of Judicial Officer

Lee T. Swicki

Signature of Judicial Officer

### AFFIDAVIT OF TASK FORCE AGENT ERIC KOTCHIAN

Task Force Agent Eric Kotchian deposes and states as follows:

### I.  INTRODUCTION

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since July 2002.  Since April 2004, I have been assigned to the Drug Enforcement Administration ("DEA") Organized Crime Drug Enforcement Task Force ("OCDETF") Group in Boston, MA.  Prior to my employment with ATF, I was employed as a Deputy U.S. Marshal for approximately four years and a Deputy Sheriff with the Essex County Sheriff's Department in Massachusetts for approximately five years.  I am responsible for investigating criminal violations of the Federal alcohol, tobacco, firearms, arson and explosives laws.  I attended the Criminal Investigator Training Program and the U.S. Marshals Basic Training Academy at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia from May, 1998 to August 1998, where I received training and instruction that included firearms training, the execution of search and arrest warrants, investigative techniques and legal instruction, which covered Fourth Amendment searches and seizures.  I also attended specialized training known as New Professional training through ATF at FLETC from February, 2003 to April, 2003, where I received instruction in firearms technology and identification, firearms trafficking, explosives and arson.

2.      During the course of my law enforcement career, I have had extensive experience in the investigation of the activities of narcotics and firearms traffickers.  I have participated in numerous narcotics investigations as a case agent and in a subsidiary role.  I have written and/or participated in the execution of numerous search warrants.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered: (a) controlled substances, such as cocaine and oxycodone, also known as oxycontin; (b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales,

1

rubber gloves, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, as well as cutting material to dilute the potency of the controlled substance, including, caffeine pills and vitamins; (c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the distribution of controlled substances; (e) cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, and checkbooks; and (f) firearms and other dangerous weapons.

3.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

4.    Based upon my training and experience, as well as the knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also typically be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s).

2

Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to conduct their drug trafficking business efficiently.

5.      It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

6.      Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

7.      My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described in the training and qualifications portion of this affidavit; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and (c) from this particular investigation and other investigations involving consensually recorded phone calls and controlled purchases of cocaine and oxycodone.

## II. **THIS INVESTIGATION**

8.      I have personally participated in the investigation of the subjects identified in this Affidavit since February 2005. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other Agents of the DEA, other federal, state and local

3

law enforcement agencies, oral and written reports of conversations and meetings with the
confidential source described herein and a review of consensually recorded conversations as well as
my own personal participation in the investigation which includes surveillance and independent
investigation.

9.      I am submitting this affidavit for two reasons: (A) in support of a criminal complaint
charging (1) RAFAEL GONZALEZ and (2) LAWRENCE PITCHER with conspiracy to distribute
500 grams or more of cocaine, a Scheduled II controlled substance, and oxycodone, a Scheduled
II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1),
841(b)(1)(A)(i) and 841(b)(1)(C); and (B) in support of an application for the issuance of a Search
Warrant to be executed at 14 Cousins Street, Apartment No. 2, Salem, MA (hereinafter "the Target
Location") referred to below and as further described in **Attachments A.**

10.     This affidavit includes a summary of events that I am personally familiar with as well
as the observations and knowledge related to me by other DEA agents and other federal, state and
local law enforcement agencies.  This affidavit does not set forth all the facts developed during the
course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to
establish probable cause to believe that GONZALEZ and PITCHER have committed the above
described controlled substance violations, and that the aforementioned Target Location contains
evidence, proceeds, and contraband relating to the possession, distribution, and trafficking of cocaine
and other evidence tending to prove that the aforementioned target subjects have violated 21 U.S.C.
§846.

## A. DEA Cooperating Source of Information (CS-1)

11.     In February and March 2005, a cooperating source of information (hereinafter CS-1)
told me and other law enforcement agents that RAFAEL GONZALEZ distributes cocaine and
Oxycodone in the North Shore area of MA.  CS-1 has been cooperating with law enforcement since
approximately February 2005 following his arrest on MA State drug charges in January 2005.  CS-1
has been cooperating with law enforcement in hopes of obtaining leniency in sentencing or

4

prosecution in this case. As further described herein, the information that CS-1 has provided has been corroborated by independent investigation including surveillance and recorded phone calls.

12.     According to CS-1, GONZALEZ offered to sell CS-1 80 milligram Oxycodone tablets (also known as "Oxycontin") for $37 per tablet. CS-1 further stated that GONZALEZ was willing to sell CS-1 a one-hundred pack of Oxycodone tablets. CS-1 also said that GONZALEZ drove a black BMW X5 SUV which is registered to GONZALEZ's son, and lived somewhere in Salem, MA. CS-1 was later shown a photograph for RAFAEL GONZALEZ from the MA Registry of Motor Vehicles (MA RMV) and positively identified RAFAEL GONZALEZ as being the same person CS-1 know as RAFAEL GONZALEZ.

## B. April 1, 2005 Purchase of 100 Oxycontin Tablets from GONZALEZ and PITCHER

13.     On March 31, 2005, at approximately 8:17 p.m., GONZALEZ called CS-1 and told CS-1 that he (GONZALEZ) was all set to meet with CS-1 at approximately 5:00 p.m. the next day on Friday (April 1, 2005) to conduct a drug transaction with CS-1. During the call, GONZALEZ told CS-1 that he (GONZALEZ) had spoken to his source-of-supply for Oxycontin and that he (GONZALEZ) would be bringing his source-of-supply for Oxycontin to the meeting. GONZALEZ further stated that his source-of-supply for Oxycontin was a black male who was from either Salem or Lynn named "Larry." The call was not recorded or monitored by law enforcement agents.

14.     On April 1, 2005, at approximately 5:10 p.m., myself and other law enforcement agents met with CS-1. During the meeting, CS-1 made several consensually monitored and recorded telephone calls to GONZALEZ to determine the time and location of the drug transaction. During the final recorded telephone conversation, GONZALEZ instructed CS-1 to meet him (GONZALEZ) and "Larry" at Ancient Order of Hibernians (AOH) Club located on Boston Street in Salem, MA. Before the transaction, CS-1 was also equipped with a concealed recorder/transmitter in order to monitor and record the transaction.

15.     The same day, April 1, 2005, at around 6:48 p.m., CS-1 drove to the meeting location at AOH Club on Boston Street. CS-1 parked in the parking lot at Kiki's Chinese Restaurant, walked

5

across the street and got into backseat of a tan/brown Toyota Camry Sedan, bearing MA registration 99 LR 12 (registered to LAWRENCE B. PITCHER) with GONZALEZ seated in the front passenger seat and a black male who GONZALEZ indicated was "Larry" (later identified as LAWRENCE B. PITCHER) in the driver's seat. While inside the car, GONZALEZ gave CS-1 a sample of cocaine and "Larry" handed CS-1 a one hundred-pack of 80 milligram oxycodone ("oxycontin") tablets. In exchange for the 100 oxycontin tablets, CS-1 provided "Larry" with \$3,700. GONZALEZ told CS-1 that he (GONZALEZ) charged \$750 per ounce (of cocaine). "Larry" provided CS-1 with his (Larry's) telephone number, (978) 836-8421, for future oxycontin transactions. According to laboratory analysis, the substances contained oxycondone and cocaine respectfully.

## C. April 26, 2005 Purchase of 200 Oxycontin Tablets from PITCHER

16.     On April 14, 2005, CS-1 saw GONZALEZ in Salem, MA. During the conversation, which was not monitored or recorded by law enforcement, GONZALEZ asked CS-1 if the oxycontin that CS-1 had purchased from himself and "Larry" had worked out okay. CS-1 told GONZALEZ that everything had worked out with the oxycontin and that CS-1 would be calling "Larry" (PITCHER) to arrange the purchase of more oxycontin.

17.     On April 25, 2005, CS-1 spoke with "Larry" (PITCHER) over the telephone number (978) 836-8421, the number which Larry had provided to CS-1 during the transaction on April 1, 2005. During the conversation, under the direction of law enforcement agents, CS-1 arranged to purchase two-hundred 80 mg oxycodone ("oxycontin") tablets from "Larry" the next day on April 26, 2005. The phone call was recorded, but was not monitored by law enforcement.

18.     On April 26, 2005, at approximately 4:00 p.m., myself and other law enforcement agents met with CS-1. During the meeting, CS-1 made a consensually monitored and recorded telephone call to "Larry" at telephone number (978) 836-8421. During the recorded conversation, CS-1 arranged to meet with "Larry" in the same parking lot at Kiki's Chinese Restaurant near Boston Street in Salem. Before the transaction, CS-1 was also equipped with a concealed recorder/transmitter in order to monitor and record the transaction.

6

19.     CS-1 arrived at Kiki's at around 5:35 p.m. At around 6:16 p.m., DEA SA Hersey and I observed a black male arrive in a brown/tan Toyota Camry who matched a MA RMV photograph of LAWRENCE B. PITCHER, the registered owner of the tan/brown Toyota Camry. According to CS-1 this individual was "Larry," the same individual from whom CS-1 purchased 100 tablets of oxycontin on April 1, 2005. When PITCHER arrived, CS-1 got into the front passenger seat of PITCHER's Camry. PITCHER was the driver and sole occupant of the vehicle. While inside the Camry, PITCHER gave CS-1 two-hundred 80 mg oxycodone ("oxycontin") tablets in exchange for $7,400. CS-1 told PITCHER that CS-1 had a friend who was interested in purchasing 500 to 1,000 oxycontin tablets from PITCHER. PITCHER told CS-1 that he (PITCHER) would give CS-1's friend a $1 discount per tablet if CS-1 purchased 1,000 tablets or more. CS-1 also told PITCHER that he wanted to purchase cocaine. PITCHER told CS-1 that he works for GONZALEZ by dropping things off which CS-1 understood to mean that PITCHER delivers cocaine to customers for GONZALEZ. According to laboratory analysis, the substance purchased from PITCHER contained oxycodone.

## D. April 29, 2005 Purchase of 4 Ounces of Cocaine from PITCHER and GONZALEZ

20.     On April 27, 2005, at around 6:25 p.m., CS-1 made a consensually recorded phone call to GONZALEZ at telephone number (978) 979-1233 which was monitored by law enforcement agents. During the recorded conversation, CS-1 asked GONZALEZ if CS-1 could meet up with GONZALEZ on Friday (April 29, 2005). GONZALEZ instructed CS-1 to call "Larry" (PITCHER). CS-1 asked GONZALEZ if CS-1 should call "Larry" "even for the other stuff" (referring to cocaine). GONZALEZ answered by saying "Yeah, well Larry. . . "and then told CS-1 that he would call CS-1 back. At around 6:26 p.m., CS-1 received a telephone call from GONZALEZ from telephone number (978) 979-1233. The telephone conversation was monitored and recorded by law enforcement agents. During this telephone conversation, CS-1 asked GONZALEZ if he (GONZALEZ) gives him (PITCHER) "the whatever" (referring to cocaine) and if PITCHER worked for GONZALEZ. GONZALEZ answered, "yeah." GONZALEZ told CS-1 that PITCHER sells the

7

"other ones" (referring to oxycontin). CS-1 asked GONZALEZ if the price was still going to be "seventy-five" ($750 per ounce of cocaine). GONZALEZ responded, "yeah, the same." Then at 6:36 p.m., CS-1 placed a consensually monitored and recorded telephone call to PITCHER at telephone number (978) 836-8421. During the conversation, CS-1 asked PITCHER about "the stuff" (referring to cocaine) that PITCHER gets off "Raf" (referring to RAFAEL GONZALEZ). CS-1 told PITCHER that CS-1 and his buddy wanted to purchase "four to five O-Z's" (referring to four to five ounces of cocaine). CS-1 asked PITCHER if they could meet on Friday (April 29, 2005) to conduct the transaction and PITCHER answered by saying "definitely."

21.     On April 29, 2005, at around 3:21 p.m., CS-1 placed a telephone call to PITCHER at telephone number (978) 836-8421. The telephone conversation was monitored and recorded by law enforcement agents.     During the recorded conversation, PITCHER told CS-1 that he (PITCHER) was waiting on "Ralphy" (GONZALEZ). PITCHER said that he had "three" (ounces of cocaine) but was waiting on "Ralphy" (GONZALEZ) to get "the other two" (ounces of cocaine). At around 5:00 p.m., CS-1 placed a telephone a call to PITCHER at telephone number (978) 836-8421. The telephone conversation was monitored and recorded. During the recorded conversation, PITCHER told CS-1 that he had "two" (ounces of cocaine) but not the "five" (ounces of cocaine) that CS-1 wanted to purchase. PITCHER further stated that he (PITCHER) had "other shit" (ounces of cocaine) that did not come from GONZALEZ, but PITCHER did not want to give him it because CS-1 was "Ralphy's boy." CS-1 arranged to purchase the two ounces of cocaine that PITCHER had from GONZALEZ plus the three ounces of cocaine that PITCHER had from his own supply.

22.     The same day, April 29, 2005, at around 5:31 p.m., CS-1 met with PITCHER in PITCHER's tan/brown Toyota Camry on Boston Street in Salem near Kiki's Chinese Restuarant. While in the Camry, PITCHER gave CS-1 approximately four ounces of cocaine in exchange for $3,250. According to laboratory analysis, the substance contained cocaine.

**E. May 3, 2005 Purchase of 10 Ounces of Cocaine from PITCHER and GONZALEZ**

23.     On May 2, 2005, between approximately 8:30 p.m. and 9:00 p.m., under the direction

8

of law enforcement agents, CS-1 made two consensually recorded phone calls with PITCHER. The calls were recorded but were not monitored by law enforcement agents. During the two recorded phone calls, CS-1 and PITCHER arranged for CS-1 to purchase ten ounces of cocaine from PITCHER. During the first recorded call, PITCHER told CS-1 that he (PITCHER) had to call GONZALEZ and would get back to CS-1. During the second recorded call, PITCHER told CS-1 that they were "all set" to conduct the transaction for the ten ounces of cocaine the next day on Tuesday (May 3, 2005).

24.     On May 3, 2005, at around 4:15 p.m., CS-1 talked with PITCHER in a telephone conversation which was monitored and recorded by law enforcement agents. During the recorded call, PITCHER told CS-1 that he (PITCHER) was waiting on "him" (referring to GONZALEZ) and that "he" (GONZALEZ) told PITCHER that "he" (GONZALEZ) would have "it" (the ten ounces of cocaine) by 5:00 p.m. PITCHER also told CS-1 that he (PITCHER) wanted to meet at the Stop and Shop in Peabody. During a call which was recorded and monitored by law enforcement at around 4:34 p.m., PITCHER told CS-1 that "he" (GONZALEZ) said that "he" (GONZALEZ) would be home in a half hour.

25.     The same day, May 3, 2005, at around 5:24 p.m., Det. William Jennings from the Salem Police Department observed GONZALEZ arrive at his residence at 14 Cousins Street, Apt. #2, driving a black Honda Civic bearing MA registration plate 43-CP-17 (registered to Michelle Arpin who is believed to be GONZALEZ's girlfriend). Detective Jennings observed GONZALEZ exit the Honda, retrieve items from the trunk and enter 14 Cousins Street. A short time later, Det. Jennings observed a female arrive in the area of 14 Cousins Street driving GONZALEZ's BMW X5 (MA Reg. 31-MC-25). The female parked and entered 14 Cousins Street. At approximately 6:00 p.m., Det. Jennings observed PITCHER arrive in area of 14 Cousins Street driving his tan/brown Toyota Camry. PITCHER parked on Cousins Street across the street from GONZALEZ's residence, exited his car and entered 14 Cousins Street. At approximately 6:05 p.m., Det. Jennings observed PITCHER leave the residence and drive away from the area in his Toyota Camry. Essex County

9

Drug Task Force Member Tpr. Foster to followed PITCHER until around 6:09 p.m. but terminated surveillance when Tpr. Foster observed PITCHER acting in a manner consistent with recognizing that he was being surveilled. At around 6:11 p.m., TFA Geibel observed PITCHER arrive at the Stop and Shop parking lot in Peabody. TFA Geibel observed PITCHER get out of his Toyota Camry and get into an undercover law enforcement vehicle which was operated by CS-1 with Det. Sean Conners of the Gloucester Police Department (who was acting in an undercover capacity) in the front passenger seat. While inside the vehicle, PITCHER handed Det. Conners approximately ten ounces of cocaine. In exchange for the cocaine, Det. Conners-1 gave PITCHER $7,200. Following the transaction, a field test was conducted of the suspected of cocaine which Det. Conners and CS-1 acquired from PITCHER and which returned a positive reaction for the presence of cocaine.

## F. May 23, 2005 Purchase of 10 Ounces of Cocaine from PITCHER and GONZALEZ

26.    On May 10, 2005, at around 9:43 p.m., CS-1 received a phone call from PITCHER who was calling from telephone number (978) 836-8421. The call was recorded and monitored by law enforcement agents. During the recorded call, CS-1 asked PITCHER if he (PITCHER) would be ready to meet CS-1 on Thursday (May 12, 2005). PITCHER said he would be ready by Thursday. CS-1 told PITCHER that CS-1 wanted the "same thing as last time" (10 ounces of cocaine). PITCHER acknowledged by saying, "Yeah, alright, cool." PITCHER also said that he (PITCHER) might be able to do it tomorrow but he (PITCHER) needed to see "this dude first." CS-1 asked if that person was "Raf" (GONZALEZ) to which PITCHER responded in the affirmative. In subsequent telephone conversations with CS-1, however, the ten ounce cocaine transaction was delayed until May 23, 2005.

27.    On May 23, 2005, at approximately 7:17 p.m., Det. Jennings observed PITCHER arrive in the area of 14 Cousins Street driving his tan/brown Toyota Camry. PITCHER parked and entered 14 Cousins Street. (Earlier the same day, starting around 4:41, other law enforcement agents and I had observed GONZALEZ's black BWM X5 SUV and Arpin's Honda Civic parked in the area of 14 Cousins Street.). At around 7:23 p.m., Det. Jennings observed PITCHER exit 14 Cousins

10

Street with his hands in his jacket pocket and departed the area in his tan/brown Toyota Camry. Law enforcement agents then followed PITCHER as he drove to the pre-determined location for the drug transaction, the Stop and Shop parking lot in Peabody. PITCHER arrived at the Stop and Shop parking lot at around 7:30 p.m. PITCHER got out of his Toyota Camry and got into an undercover law enforcement vehicle which was operated by CS-1 with Det. Sean Conners of the Gloucester Police Department (acting in an undercover capacity) in the front passenger seat. While inside the vehicle, PITCHER handed Det. Conners approximately ten ounces of cocaine. In exchange for the cocaine, Det. Conners gave PITCHER $7,250. Following the transaction, a field test was conducted of the suspected of cocaine which Det. Conners and CS-1 acquired from PITCHER and which returned a positive reaction for the presence of cocaine.

### III. TARGET LOCATION

## 14 Cousins Street, Apartment No. 2, Salem, MA (Residence of RAFAEL GONZALEZ)

### A.    Description of premises

28.    This is a two-story off-white (beige), two-family dwelling with a white aluminum front door bearing the number "14" in black lettering. Apartment No. 2 is located on the Second Floor. There are two black mailboxes attached to the front of the dwelling (one on either side of the front door). The mailbox to the right of the front door for Apartment No. 2 bears the names "Aprin" and "Gonzalez." There is a narrow walkway to the right of the dwelling. (Photographs of 14 Cousins Street are included as part of **Attachment A).**

### B.    Link to Drug Trafficking Activities

29.    I believe that the primary residence of RAFAEL GONZALEZ is 14 Cousins Street, Apartment No. 2, Salem, MA and that GONZALEZ uses this residence to store cocaine, drug proceeds, and other evidence concerning cocaine sales and distribution based upon the following facts: **1)** As further described above, during two separate undercover drug purchases from PITCHER on May 3, 2005 and May 23, 2005, law enforcement agents observed PITCHER, drive to and enter 14 Cousins Street and then immediately proceed to the drug transaction location to deliver the cocaine to the undercover agent. During consensually recorded phone conversations, PITCHER told CS-1 that he (PITCHER) worked for GONZALEZ delivering cocaine and obtained cocaine from GONZALEZ. During one recorded conversation prior to a cocaine transaction, PITCHER told CS-1 that he (PITCHER) was waiting for GONZALEZ to obtain cocaine from GONZALEZ for CS-1. **2)** Physical surveillance conducted on several occasions from approximately March 2, 2005 to May 23, 2005, has observed a black BMW X5 SUV parked in the area of 14 Cousins Street. This vehicle is registered to GONZALEZ's son (also Rafael Gonzalez) at 14 Cousins Street, Apt. #2, and according to CS-1 is the vehicle that GONZALEZ operates. Agents have also observed a Honda Civic parked in the area of 14 Cousins Street which is registered to Michelle Arpin, the female with whom GONZALEZ's resides at 14 Cousins Street. Furthermore, the names "Arpin" and "Gonzalez" are

12

clearly indicated on the mailbox for Apartment No. 2. **3)** According to MA Electric the listed subscriber for electrical service at 14 Cousins Street, Apartment No. 2 has been Michelle Arpin since December 30, 2003. **4)** There are only two mailboxes visible on the dwelling. The mailbox listed for Apartment No. 1 bears three names that have no known connection to the drug trafficking activities of the target subjects described herein. **5)** According to public records, Michelle Arpin currently owns 14 Cousins Street, but resides specifically in Apartment No. 2. Furthermore, the prior owner of 14 Cousins Street was also listed as living in Apartment No. 2.

## IV. CONCLUSION

30.     Based on the information contained in this affidavit, I submit that there is probable cause to believe that: **(A)** (1) RAFAEL GONZALEZ and (2) LAWRENCE PITCHER have committed the crime of conspiracy to distribute 500 grams or more of cocaine, a Scheduled II controlled substance, and Oxycodone in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B)(ii) as set forth in the accompanying criminal complaint; and **(B)** the above described Target Location, further described in **Attachment A,** contains evidence, proceeds, and contraband relating to the possession, distribution, and trafficking of cocaine and other evidence tending to prove that the above listed target subjects have violated 21 U.S.C. §846.

I declare that the foregoing is true and correct.

ERIC KOTCHIAN
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to
before me this 1st day of
June 2005.

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

13

## ATTACHMENT A

### 14 Cousins Street, Apartment No. 2, Salem, MA

This is a two-story off-white (beige), two-family dwelling with a white aluminum front door bearing the number "14" in black lettering. There are two black mailboxes attached to the front of the dwelling (one on either side of the front door). The mailbox to the right of the front door for Apartment No. 2 bears the names "Aprin" and "Gonzalez." There is a narrow walkway to the right of the dwelling. (Photographs of 14 Cousins Street are included as part of **Attachment A).**



