UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    Crim. No. 05-10182-JLT-02

V.

LAWRENCE PITCHER

**DEFENDANT'S SENTENCING MEMORANDUM**

The following sentencing memorandum is provided to the Court in order to assist the Court in arriving at a just and appropriate sentence. The defendant reserves the opportunity to make additional comments through counsel at the time of sentencing.

I.  OVERVIEW

On April 25, 2006, Lawrence Pitcher, age 26, pled guilty to the six counts contained in the indictment, charging him with Conspiracy to Distribute Oxycondone and 500 grams or more of Cocaine, 18 USC § 846, 2 counts of Distribution of Oxycodone and Aiding and Abetting, 18 USC § 841 (a) (1), and 18 USC §§ 2, and 3 counts of Distribution of Cocaine, and Aiding and Abetting, 21 USC. § 841 (a) (1) and 18 USC § 2.  The criminal activity in question took place from February, 2005 until his arrest on June 2, 2005. At the time the defendant was a 24 year old, impressionable, inexperienced, and easily manipulated young man.  He began using drugs at a very young age, and a few months prior to the investigation leading to his arrest in this case he was heavily using drugs on a daily basis, particularly the highly addicting opiate, oxycodone.  It was at this time in his life, between dead-end jobs that he came under the influence of his co-defendant, Rafael Gonzalez, the father of one of his best friends. Gonzalez used the defendant and gradually got him involved in the drug trade, primarily as his delivery boy, and then taking advantage of the defendant's oxycodone habit, urged him to supply that drug to the cocaine customers, which the defendant did in order to provide himself with a steady supply of the drug. That the defendant made some money during the course of this relationship is acknowledged, but it was hardly enough to pay his bills, only receiving $50 per ounce he delivered for Gonzalez,

1

and an equally small amount for his oxycodone sales, which, again, were undertaken primarily to feed his own consumption of this expensive and highly addictive drug.

Mr. Pitcher is completely aware that his own drug addiction at that time cannot justify his misguided and reckless decision to be influenced by his co-defendant into getting into the drug trade. He accepts complete responsibility for his actions and feels the deepest regret for having caused so much harm and shame to his family and to himself. Had he instead made the choice of going out to California to be guided and encouraged by his uncle, Roger [Pitcher] Breedy, a successful union painting contractor in the San Francisco Bay area, instead of the low-life father of his then best friend, Rafael Gonzalez, he would never come before this or any Court. Instead, he would have his own business, something he is on his way to achieving. During the spring of 2007, the defendant completed a six-month program required to take the test necessary to obtain a license to become a Painting and Decorating Contractor in the State of California. This March, he passed his test, and his license is pending the outcome of this case. Simply put, during the period of time from the date of his arrest to today the defendant has made an extraordinary effort to rehabilitate himself and has become a vital and positive member of his community in Oakland California, far from the biker/druggie culture that lured him in on the North Shore of Boston.

In arriving at a just and appropriate sentence, the Court is respectfully requested to consider the unique circumstances surrounding Mr. Pitcher's criminal involvement as well as his remarkable success and rehabilitation over the past 3 years.

II. **BASED ON *BOOKER*, *KIMBROUGH* AND *GALL* THE SENTENCING GUIDELINES ARE ONLY ONE OF THE VARIOUS FACTORS THE COURT SHOULD CONSIDER IN ARRIVING AT AN APPROPRIATE SENTENCE**

Prior to the United States Supreme Court decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Sentencing Guidelines were mandatory. Practically speaking, this meant that the sentencing courts were required first to determine the applicable guideline range and then sentence defendants within that range. The Sentencing Guidelines did provide for technical departures which were granted sparingly except in cases where the defendant provided substantial assistance to the Government pursuant to USSG § 5K1.1. Factors such as age,

education, mental and physical condition, employment record, and family ties and responsibilities were discouraged as grounds for formal departure. (See USSG § 5H1.1 through 5H1.6). Lack of guidance as a youth [see § 5H1.12] was specifically prohibited as a ground for departure. In addition, "the history and characteristics of the defendant [18 USC § 3553 (a)(1)] were deemed largely irrelevant with respect to sentencing.

The Guidelines were implemented in 1987 with an avowed purpose to promote uniformity in sentencing across the country and to "avoid unwarranted sentence disparities among defendants wit similar records who have been found guilty of similar conduct [18 USC § 3553 (a)(6)]." The actual effect of the mandatory guidelines was to limit the ability of District Court Judges to craft individualized justice based on the totality of the circumstances in a particular case.

Booker, and more recently, Gall v. United States, 128 S.Ct. 586, and Kimbrough v. United States, 128 S.Ct. 558 (2007), have dramatically changed the sentencing process. See also, United States v. Martin, 520 F.3d 87 (1st Cir. 2008); United States v. Rodriquez, 2008 WL 2265898 (1st Cir. 2008). While District Judges must still calculate the applicable guidelines, it is but the first step in the sentencing process. The advisory guidelines are now only one of seven factors set forth in 18 USC § 3553 (a) that the Court must consider in determining the sentence.[1]

In Gall, the Supreme Court set forth a deferential abuse of discretion standard which affords district courts significant latitude when determining the appropriate sentence:

> "We reject, however, an appellate rule that requires "extraordinary"

---

[1] The sentencing factors set out in 18 USC 3553 (a), are as follows: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentence available; (4) the kinds of sentence and the sentencing range established for--(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--(i) issued by the Sentencing Commission pursuant to 28 USC 994 (a)(1) and (6), the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

> circumstances to justify a sentence outside the Guidelines range.
> We also reject the use of rigid mathematical formula that uses the
> Percentage of a departure as the standard for determining the strength
> of the justifications required for a specific sentence."

Succinctly, Gall's message is that the Guidelines are truly advisory and only one of the § 3553 (a) factors to be considered in arriving at an appropriate sentence. To deviate from the Guidelines the circumstances need not be "extraordinary"; rather, District Court judges now have a mandate to consider the totality of the circumstances involved in the case and to tailor the sentence accordingly.

### III. THE DEFENDANT IS IN AGREEMENT WITH THE PROBATION OFFICER'S GUIDELINE CALCULATIONS

In the Presentence Investigation Report (hereafter PSR), the Probation officer finds that Mr Pitcher " is accountable for quantities of cocaine and oxycodone which are equivalent to approximately 545 kilograms of marijuana. Pursuant to USSG § 2D1.1 (c) (6), since the amount of marijuana is at least 400 kilograms, but less than 700 kilograms" the base offense level is 28.  The Probation Officer deducted 2 levels based on the fact that Mr. Pitcher meets all 5 criteria required for the "safety valve" [§ 2D1.1(b) (11), and 3 more levels for his Acceptance of Responsibility [§ 3E1.1(a) and (b)].  Thus Mr. Pitcher's Total Offense level is 23 which at his Criminal History Category I equates to an advisory guideline range of 46 to 57 months. ( See PSR ¶¶ (40)- (47), (116).

In the plea agreement entered into by the defendant and the Government, after considerable discussion the parties established a lower amount of drugs and, therefore, offense level, level 26, which when combined with the safety valve and acceptance deductions, had the advisory guideline range of  21, or 37-46 months.  The parties also agreed that a motion for downward departure pursuant to  USSG §5K1.1, would be filed by the government if appropriate. [2] (See Sentencing Agreement attached to PSR, pages 2-3, ¶3.(a), (b), (e), and pages 5-6, ¶ 6. a.-d.)

---

[2]  As the Court is aware, the government has made certain filings relevant to this aspect of  the sentencing process, and the defendant during the sentencing hearing will urge the Court to

4

The defendant had raised certain objections to the initial PSR calculations regarding the amount of drugs calculated, a downward departure for minor role [USSG § 3B1.2 (b)], and also for extraordinary post-arrest rehabilitation[3] [USSG § 5K2.0]. (See Addendum to the PSR, pages 30-33). However, upon review of the Probation Officer's position he has decided to waive any objections and the need for a Rule 32 hearing on these issues and is content to rely upon the Court's consideration of the totality of the circumstances when determining an appropriate sentence in this matter.

IV.     ANALYSIS OF THE 3553 (a) SENTENCING FACTORS

Based upon United States v. Booker, 543 U.S. 220 (2005), and more recently Gall v. Untied States, 128 S. Ct. 586 (2007), and Kimbrough v. United States, 128 S.Ct. 558 (2007), the Sentencing Guidelines are now advisory and only one of the § 3553(a) factors which the Court must consider when arriving at an appropriate sentence. Furthermore, in Gall, the Supreme Court clearly stated that the circumstances of a case need not be extraordinary to justify a sentence outside of the advisory guidelines. He following analysis of the sentencing factors in Mr. Pitcher's case is hereby provided.

§ 3553 (a) (1):

*The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

Although much regarding the nature of the offense and the defendant's history and family information is contained in the PSR, especially a detailed analysis of the his family circumstances as he grew up in Boston's North Shore, (PSR ¶¶ (56)- 76), pp. 16-18), it is important for the Court to note that the defendant's venture into criminal behavior was the

---

particularly consider this aspect of the defendant's overall circumstances when determining the appropriate sentence.

[3] It should however be noted that the reason for the denial of the post-offense rehabilitation objection by the Probation Officer was because at the time he entered the Sentencing Agreement, over two years ago, the defendant indicated that he would not seek any guideline departures not specifically mentioned in the agreement. (See Plea Agreement, page 4). This ground, it is respectfully submitted, could not have been waived by the defendant as it did not then exist. It is primarily upon the defendant's actions since he moved to California around the time of the Plea Agreement that he bases his extraordinary post-arrest rehabilitation argument.

5

result of his being a naïve, impressionable, easily manipulated young man with a significant drug problem. As Mr. Pitcher's mother points out, she was "shocked, disappointed, and scared when the defendant told her about the mistake he made which resulted in the present criminal charges. …[H]e [was] a hard worker, who always does what he is supposed to do. Although she is sad that he lives on the other side of the country, she is glad that he has separated himself from negative influences in Massachusetts and has established a positive life for himself in California." (PSR, ¶(75), p.18). She also indicated that when the defendant was growing up she never had "concerns about the defendant or her children using drugs or hanging out with the wrong crowd. She recalls that the defendant had a close-knit group of friends who were involved in positive activities. One of those friends was the son of the defendant's co-defendant, Rafael Gonzalez." (PSR, ¶ (74), p. 18).

It was when the defendant returned in 2003 from California after helping his uncle Roger [Pitcher] Breedy through a difficult convalescence following an industrial accident that the defendant found himself living at his grandparents home in Salem without a positive and steadying influence that he began to abuse drugs, took a series of dead-end jobs, and then met the father of his close friend, Rafael Gonzalez, just released from prison on drug charges. Mr. Pitcher, then 21 started to hang around with the wrong crowd, which now included his boyhood friend and his father, started experimenting with drugs, and lead himself to a serious oxycontin habit which he supported by being a courier for Gonzalez' cocaine business and selling oxycontin. Since his arrest in June of 2005 he has remained drug free and involved in Narcotic Anonymous. More importantly, he left the North Shore and began living and working again with his uncle Roger, a successful union contractor in the San Francisco Bay area. Under his guidance, Mr. Pitcher has matured into a hard working, positive urban success story – a long, long way from the groundless and easily lead drug abuser/courier he was in Salem in the spring of 2005. It has been a complete metamorphosis, the kind that is so extraordinary that it cannot be counted as simple acceptance of responsibility.[4] He is now on the doorstep of creating his own union painting contracting business, one that could mirror

---

[4] This is the kind of post-arrest rehabilitation which is "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission when formulating the guidelines, that deserves consideration for a downward departure. See, e.g., Unites States v. Sklar, 920 F.2d 107, 111-16 (1st Cir. 1990); United States v. Wilkes, 130 F. Supp. 222, 240-41 (D. Mass. 2001).

the success of his uncle's, and make him a truly valued employer and member of his community in the San Francisco Bay area. His license, achieved after a six month program at night while he worked hard each day for his uncle's company, awaits the outcome of this sentencing.

In <u>Gall</u>, much of the District Court's rationale for sentencing the defendant to probation, despite an advisory guideline range of 30 to 37 months, was the fact that with the exception of his criminal conduct, his adult life was filled with substantively positive deeds. Mr. Gall ceased using drugs, obtained a degree, worked as a carpenter, and started his own window and door business. The government did not dispute the information regarding Mr. Gall's positive life and work activities during the five years following his criminal activity, but nevertheless argued the guidelines had to be followed. The District Court Judge, however, disagreed and sentenced him to probation. In addition to citing Mr. Gall's impressive rehabilitation since his criminal involvement, the Court cited the fact that he had no other criminal record; that he was unlikely to ever re-offend; that probation constitutes a substantial restriction of freedom; and that society would be better served having Mr. Gall out in the world contributing positively as opposed to having him incarcerated.

What is significant in the District Court's decision to sentence Gall to probation is that the decision was largely influenced by the "history and characteristics of the defendant." In other words, the District Court Judge gave substantial weight to the circumstance that with exception of his criminal conduct, he had led a good life. He was a good person doing good things, a positive force in the community. His criminal conduct had been of fairly brief duration, he had withdrawn from unlawful activity and stopped using drugs, and was unlikely to re-offend.

The only difference between Mr. Gall and this defendant is on the much more positive point of substantial assistance which began upon his arrest, and which will be dealt with in more detail at the hearing. Suffice it to say that in the three-plus years that have past since his arrest, everything Mr. Pitcher has done is positive and clearly indicates that he is a valuable member of his community, drug free, and on his way to making himself a true urban success story. He has no prior criminal history, has never before succumbed to the negative influences which lead him to this conduct, and based upon the past three years, his strong conviction to stay on the path of

7

success, his almost immediate contrition and substantial cooperation, is highly unlikely to re-offend.

Gall sends the clear, powerful message that a defendant's "history and characteristics" really do matter, and in the right case, can tip the scales toward a substantially reduced sentence. Furthermore, Gall clarifies that the circumstances need not be "extraordinary" to justify what has come to be known as a "Booker" variance. While in Mr. Gall's circumstances nothing could be deemed extraordinary, in comparison, Lawrence Pitcher's are. In the spirit of Gall, he asks you to consider him as the man now standing before you, understanding his prior addiction and the poor influences that lead him to this isolated and brief criminal behavior, and to arrive at an appropriate sentence in view of his present life, its complete turnabout and his positive prospects as a valuable member of his community.

*The need for Just Punishment*

Prior to the Booker and Gall decisions, sentences in Federal drug cases were based on quantifying the drug amount combined with an evaluation of the defendant's relative role in the case. The degree of guilt and the resulting sentence was typically based on a somewhat mechanical application of the then mandatory guidelines. Now, however, in the post-Booker, post-Gall climate, District Court judges once again have the right and duty to be "judges," to weigh the actual seriousness of the crime and to evaluate the actual harm caused by the crime.

In this case the harm caused by Mr. Pitcher's criminal conduct was, it is submitted, fairly minimal. Almost all of the drugs he is being held accountable for were confiscated. They did not go out into the community.

In addition, Mr. Pitcher's decision to become involved in the transportation and delivery of cocaine was really not based upon greed or the desire for monetary gain as he was paid a pittance for his actions, rather it was based upon his misguided loyalty toward his co-defendant and his co-defendant's son, and his co-defendant's easy manipulation. As for the oxycodone activity, as set forth above and in the PSR, Mr. Pitcher was himself enmeshed in this highly addictive substance, taking 80 miligrams per day, and used the limited distribution he was involved in to further his own habit.

Finally, as will be addressed more fully during the hearing, any limited harm the defendant's actions had were clearly outweighed by his immediate and substantial cooperation.

*The Need for Adequate Deterrence*

An obvious reason for punishing Federal offenders is the goal of deterrence. Based upon the actions undertaken immediately and throughout the course of the three-plus years since his arrest, in terms of his substantial cooperation, extraordinary efforts at rehabilitation, present employment, individual growth and success make it clear that there is little risk that he will ever re-offend. Therefore, individual or personal deterrence in the form of a term of imprisonment does not appear to be necessary here.

Here is no doubt that cooperation on the part of drug offenders serves as a general deterrent to further drug crime which, in turn, protects society from the negative effects of drug abuse. Mr. Pitcher has provided substantial assistance which has resulted in drugs and offenders being taken off our streets. Thus, he has already helped to deter general drug crime.

*The Need to Protect Society from Further Crimes on the Part of the Defendant*

A prison term of any length is not necessary to protect society from further drug crimes on Mr. Pitcher's part. Based on his remorse and the problems his convictions has caused him and his loved ones, there is no risk that he will ever re-offend.

*The need to Provide the Defendant with Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner*

Until his arrest in this matter, as he acknowledged to the Probation Office, Mr. Pitcher had been using cocaine, ecstasy, and, unfortunately, oxycontin on a regular basis. (PSR ¶¶ (82)-(88), pp.19-20). From the date of his arrest he has completely stopped any use of illicit substances, and has done all he could to remain drug-free, including attending, on his own initiative, Narcotics Anonymous meetings in his home area. As he told the Probation Officer, if he is incarcerated he believes he could benefit form the 500 hour residential Drug Abuse Program offered by the Bureau of Prisons. (PSR ¶ (83), p 19). Should the Court give Mr.

Pitcher a sentence of incarceration, Mr. Pitcher requests that the Court recommend his participation in the 500 hour RDAP program.

This defendant is not in need of educational or vocational training. He is a foreman on a union commercial painting business owned by his Uncle, Roger Breedy, and he has recently completed a six month evening course necessary to obtain the license to become a commercial painting contractor himself and he plans to start his own business when these matters are concluded. As set forth in the PSR, (¶ (93), p.21), although he has passed the test, the California authorities will not issue it to him until this matter is resolved in a manner favorable to Mr. Pitcher, i.e. no period of incarceration.  There are no medical issues that cannot be obtained efficiently in his community.

*The Kinds of Sentences Available*

Under the advisory guidelines, Mr. Pitcher's offense level of 26 would be reduced by the amount of downward departure he receives pursuant to § 5K1.1.$^5$  The government has filed a Motion to Reduce, which the Court is directed to regarding the position taken therein.

Under Booker, Kimbrough, and Gall, the Court may sentence this defendant outside of the applicable advisory guidelines based on the § 3553 (a) factors addressed above. The sentence must be "reasonable" based on the District Court Judge's application of these factors. Following Gall, appellate review with respect to reasonableness will be based on a deferential abuse-of-discretion standard. See, e.g., United States v. Martin, 520 F.3d 87 (1st Cir. 2008).

*The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

During his involvement with cocaine and oxcontin, Mr. Pitcher distributed drugs to customers of his co-defendant, Rafael Gonzalez, a high-level drug dealer for many years. Mr. Pitcher was involved, for the most part, as a low-paid courier and for only about six months.

What makes this case unusual, and would seem to set it apart from the "mine-run" of Federal drug cases, is the fact that Mr. Pitcher is not a professional drug trafficker. Rather, he

---

$^5$ Since he qualifies for the "safety valve," Mr. Pitcher does not face a mandatory minimum sentence.

was, as set forth above, a naïve, highly manipulated, low-paid courier, and whatever other activity he engaged in was to keep himself supplied with a highly addictive controlled substance. Given all of the circumstances, and especially in view of his significant cooperation and his complete lack of a prior drug or any other type of criminal record, he is obviously far less culpable than his co-defendant. Simple logic supports a sentence as drastically different as the two men in question.

*The Need to Pay Restitution*

Financial restitution does not appear to be an issue in this case. A substantial amount of volunteer service to his community could be ordered as a form of societal recompense. With is level of commercial painting expertise, Mr. Pitcher could be an immense benefit to public housing organizations, such as old-age residences, drug rehabilitation centers, or other community-based non-profit agencies, if he is ordered to perform unpaid volunteer work as an element of his sentence.

*Final Comments on  3553 (a) Factors*

Viewed in their totality, the  3553 (a) factors in this case justify a sentence which does not include incarceration, but, rather, one that includes probation, a period of home confinement, and community service along with a period of supervised release. Certainly the factors discussed above, the substantial assistance, and the extraordinary post-arrest rehabilitation of this defendant present the Court with circumstances unique enough to justify a sentence which does not include incarceration.

**VI.       CONCLUSION**

In arriving at a just and appropriate sentence, this Court is respectfully asked to examine the totality of the factors present in this case and to give due consideration to Mr. Pitcher's remarkable turnaround, and to realize the futility and damage that a period of incarceration would cause his progress and future plans. He is does not pose a danger to his community. Given

the extraordinary rehabilitative effort he has put in since his arrest over three years ago quite the opposite is now true.

Dated: July 9, 2008,                                          Respectfully submitted,
                                                              Lawrence Pitcher
                                                               by his attorney,

                                                              _____
                                                              Anthony M. Cardinale
                                                              BBO # 073460
                                                              655 Summer St.
                                                              Boston, Massachusetts   02110
                                                              (617) 345-5400